Blauvelt v. Ackerman.

---

## BLAUVELT vs. ACKERMAN and others.

| 23 | 495 |
| 50 | 397 |
| 23 | 495 |
| 54 | 378 |
| 54 | 644 |

1. Where a trustee has kept his accounts in a negligent way, or kept no account whatever of his receipts, all presumptions should be strongly against him, and obscurities and doubts should not operate to his advantage, but adversely. But the rule will not be strictly applied when it will lead to conclusions at variance with the reasonable probabilities of the case.

2. When, from the whole case, the result at which the master arrived is as consonant with the evidence as a whole, and is as probably just with reference to the fixed and known data of the case, as any that could have been reached, though the court is unable to see with what precise view of the evidence the master reached the result, his report will not be set aside.

3. When the trustee has collected and charged himself with the rents arising from the trust property, in a statement of the account long open between the parties he will be allowed interest, to accrue from the date of the yearly receipts.

4. Report corrected in respect of interest.

5. Under the circumstances of this case, and the questionable manner in which the trust has been performed, commissions disallowed.

6. Whether the decretal orders in the suit have not settled the complainant's right to maintain his suit—*Quære.*

---

Argued before the Vice-Chancellor, on exceptions to master's report.

*Mr. Ransom,* for exceptant.

*Attorney-General Gilchrist,* for defendants.

THE VICE-CHANCELLOR.

In 1842, a tract of woodland of five hundred and forty-two acres, situate in James City county, Virginia, and called the Russell tract, was sold at public vendue under an order of the court of that county, and purchased by one Henry P. Banks. It was situated on what is called Ware creek, running into York river. The tract had been valued by appraisers under oath, at $900. It was bid in by Banks for $700. The purchase money was only partly paid, and, according to the terms of the sale, the commissioners retained the deed till payment of the balance. They did not deliver the deed till December 29th, 1849. Between the sale in 1842 and the delivery of the deed, the following occurred:

Banks sold his interest in the land to Peter Relyea, who sold his interest to James Blauvelt, Jr., the complainant in this suit. Blauvelt bought, in or about 1846, and gave in payment certain real estate in New Jersey, worth about $3000. He soon after sold one-half his interest to Joseph Swift, for $1850. Swift paid $100 on this purchase, and went into possession with Blauvelt, working it as a partner. The working of it consisted solely in cutting off the wood, and selling it, mostly in New York.

In 1848, Blauvelt, who was a carman in New York, being embarrassed in his affairs, or with a view to be relieved of some difficulties with his partner Swift, made an assignment in New York where he lived, to John Ackerman, Jr., of

Blauvelt *v.* Ackerman.

Bergen, New Jersey. The assignment was dated September 28th, 1848, and was a special one under the laws of that state. The assets shown by the schedule exceeded the debts, and the assignee was the first of the preferred creditors, his claim being $993.83. The assets consisted of (1) three credits amounting together to $225; (2) the unpaid purchase money, being $1750, due from Swift as above; (3) a mortgage, whose amount was not stated, and which turned out nothing; and (4) Blauvelt's half interest in the Russell tract.

In December, 1848, Ackerman went down with Blauvelt to take possession, and was at first opposed by Swift, who was there with some hands, stock, and utensils, cutting wood, making charcoal, and exercising ownership. He and Ackerman finally agreed upon a compromise settlement, by which Swift surrendered possession and what articles and property he had on the place, and received a note for $550 together with a boat load of wood, as compensation for his expenditures and property, and Ackerman, as assignee, gave up the claim against him for the $1750. The $550 Ackerman afterwards paid.

After a few weeks, Ackerman and Blauvelt returned home, leaving the premises in charge of one Moses Springer, a friend of Blauvelt, who went down with them for that purpose. Springer staid three or four months, acting under the assignee, and when he left, one Daniel Robbins, neighboring land owner, took charge and kept it till the fall of 1849.

On the 16th of June, 1849, Ackerman, as assignee, sold the interest of Blauvelt in the Virginia property at public auction, at Archdeacon's hotel, in Paterson, New Jersey. Archdeacon bid it in by previous arrangement, for the sum of $1650, and immediately sold his right to Ackerman for $25.

In December, 1849, the commissioners who had sold to Banks delivered their deed for the premises to Ackerman. In the same month, Ackerman agreed with Philip Schuyler, of New York, to sell the Virginia property to Schuyler, together with the stock and utensils thereon, for the price of

$3200, which was to be paid by Schuyler and wife conveying to Ackerman certain real estate in Tenth avenue, New York, valued at $4000, but encumbered with mortgages for about $1700, which Ackerman was to discharge as part of the purchase money. Schuyler was to pay the difference between the $3200 and the value of his Tenth avenue property, after allowing for the mortgage encumbrances. Schuyler did not get a deed for the Virginia property, but went immediately there, took possession, and held it till the summer or fall of 1853. He became unable to carry out his plans, and about that time returned to New York and gave up the Virginia property to Ackerman, without receiving anything for it from Ackerman, who continued the owner of the Tenth avenue property as before.

In October, 1855, Ackerman died. In May, 1866, his four sons and the devisees of his real estate sold the Virginia property to Albert J. Whittaker, of Trenton, New Jersey, for $2100.

The Tenth avenue property consisted of two houses and lots, one of which was leasehold. The leasehold lot was sold by Ackerman in his lifetime, and $532.85, part of the price, was recovered by him. The remainder of the price, $302, was received by his sons and executors after his death. The other lot and house in Tenth avenue was sold by Ackerman's son, to whom it had been set off after his death, for $4000. It was sold November, 1859. Ackerman in his lifetime had paid off the encumbrances on these houses and lots.

Ackerman made no settlement in court of his accounts as assignee, and left but scanty and imperfect records of his transactions.

On the 26th of January, 1858, Blauvelt filed his bill against Ackerman's four sons and their wives, against his daughter and widow, and an infant granddaughter, and against Whittaker, to whom the four sons and their wives had conveyed the Virginia property. The bill prayed an account against Ackerman's representatives, legatees, and devisees, and sought to set aside the sale to Whittaker.

Answers and a replication being filed, voluminous testimony was taken and exhibits offered, when by a decretal order, filed July 28th, 1864, it was referred to A. S. Jackson, Esq., master, to take and state an account according to the directions of said order. Testimony was again taken to a considerable amount before the master, whose report thereon was filed June 16th, 1868.

The master reported that the sale on the 16th of June, 1849, at Paterson, to Archdeacon, and the sale thereafter to Ackerman, extinguished the trust, and that in his opinion, upon the evidence generally, the bill should be dismissed for want of equity.

Exceptions were filed by the complainant to this report, and the cause was argued before the Hon. Joseph F. Randolph, sitting for the Chancellor. Upon his opinion, reported in 5 C. E. Green 141, an order was made August 10th, 1869, that the master's report be set aside, and that it be referred to Bennington F. Randolph, Esq., master, to take and report the accounts directed by the decretal order of July 28th, 1864, and that the master be governed in so doing by the views expressed in the above mentioned opinion.

The report of the master, in pursuance of the last mentioned order of reference, was filed October 18th, 1871, and the amount therein reported to be due on the 1st day of August, 1871, is $3637.59.

To this report the complainant excepted, claiming that the amount due is largely in excess of the amount allowed. By agreement of counsel the cause, as thus situated, is brought to final hearing.

Two questions are raised: *First.* Can the suit be maintained? *Second.* If it can be, what is the true amount due?

On behalf of the defendants, the main insistment has been that the bill should be dismissed, for the reasons that the trust created in Ackerman, as assignee, was extinguished by the Paterson sale; that the conduct of Blauvelt in connection with that sale, and his recognition of its validity in the following year, entitle it to have that effect; that his silence

and delay in asserting his claim discredit its *bona fides;* that his business relations with Ackerman, after the Virginia property was sold to Schuyler, are inconsistent with the existence of a large debt from Ackerman, from whom Blauvelt, after the sale, borrowed money on the security of a chattel mortgage; that the small pecuniary means possessed by Blauvelt at the time of the assignment, as shown by the schedule taken in connection with the indebtedness which Ackerman, as assignee, afterwards settled or paid, render it highly improbable and incredible that any considerable balance could have remained unaccounted for, or could have existed; that the known value of the Virginia property, at the time of the assignment and afterwards, and its known productiveness, as shown by Blauvelt's experience before Ackerman took it and by the experience of Schuyler and Whittaker afterwards, are proofs that Ackerman never realized results approaching to those which, after his death and ten years after the assignment, Blauvelt claimed by his bill; that some settlement or understanding must have existed between them, which does not now appear, and which, if Ackerman were living, would appear and rebut the equities of the suit.

Granting, for the sake of directly meeting these suggestions, that the complainant's general right to maintain his suit was not settled by the decretal orders heretofore made, I am satisfied, upon looking into the evidence and carefully collecting the facts of the case, that the complainant is entitled to a decree, and that the question now presented for solution is a question of amount. It is impossible, I think, to consider the testimony of Blauvelt himself, and the general course of his conduct with Ackerman, without feeling the force of the above suggestions on behalf of the defendants, and I am disposed to believe that if Ackerman were living, or if Blauvelt's memory were more tenacious and correct than it evidently is, important facts would be disclosed to exhibit the general course of the assignee's transactions in a more favorable light for himself than that in which they

now appear. But upon the whole case as it stands, a liability attaches to Ackerman's estate which, if somewhat indeterminate as to extent, must be attributed to his own loose and negligent manner of business. He assumed the trust at Blauvelt's request, but he was none the less bound to execute it with fidelity and account for the results with accuracy. He appears to have kept no account of his receipts, but only of his charges. These accounts are evidently imperfect, and cannot be relied on to exhibit the whole even of one side. The sale at Paterson must certainly be regarded as illegal, and in no wise affecting his liability as trustee. I concur entirely in the views expressed on this point and on others, in the opinion of Judge Randolph. Nothing definite and satisfactory anywhere appears, to show that the trust was at any time extinguished. This being so, it must be followed into all the changes of property, and the difficulties and obscurity now attaching to the settlement of details must not prevent the trust from being enforced. The best that the case admits of must be done, and the amount due ascertained with the closest practicable approximation to correctness.

The report of the master is a clear, careful, and systematic one. It covers the period from the summer of 1848 to the fall of 1859, when the last of the trust property was sold. The amount found to be due is, from the necessity of the case and the nature of the evidence, an approximation, and not an exact ascertainment. In stating the proceeds of the sales of real estate that came to Ackerman's hands, the rents received, charges paid, and encumbrances discharged, the details are undisputed and satisfactory. But in respect to what personal property, such as oxen, wood, charcoal, boats, store goods, vessel frames, &c., was on the place when Ackerman took possession in December, 1848, and how far the proceeds of these articles, or any of them, came to his hands during the year 1849, and before January, 1850, when Schuyler purchased and entered upon the premises, the character of the evidence is such that exactness, or anything like it, is unattainable. So also in regard to what Ackerman realized,

or is fairly to be charged with for the proceeds of the place during the year 1849. Any result arrived at in respect to these matters must be little less than conjectural. Out of any given number of accountants undertaking to adjust a balance or settle the particulars on either side of this period of the assignee's transactions, I take it to be certain that no two of them would deduce from the materials as they are furnished in this case similar results ; and the differences between their results would probably be large. It is with respect to these matters that six out of the complainant's ten exceptions are taken. I have given much time and attention to an·examination of these exceptions, and while I am unable to see with what precise view of the evidence the master arrived at the figures in his report in regard to the matters included in the first six of the exceptions, I am unable to see how any different figures can be inferred at all more consonant with the evidence as a whole, or more probably just with reference to the fixed and known data of the case.

Where a trustee has kept his accounts in a negligent way, or kept no account whatever of his receipts, all presumptions should be strongly against him, and obscurities and doubts should not operate to his advantage, but adversely. No doubt this is true, but I am unwilling, after looking through the whole of the evidence, and having regard to the large and evidently extravagant estimates of some of the complainant's witnesses, and the actual experiences before referred to of the owners or occupants of the Virginia property before and after the year 1849, when Ackerman held it, to say that the master could have arrived at any more equitable amount than that he has reached. The association between Ackerman and Blauvelt was such, and Blauvelt's connection with the transactions so free and unrestricted, and his acquiescence in Ackerman's management so general, that I find no sufficient ground for the belief that Ackerman intended to defraud. Blauvelt could not then have believed so himself. A severe rule, such as might in many cases be admissible and equitable where no regular and reliable account could be

produced, if applied in this case so as to accept the highest guesses or estimates of witnesses after so many years, would lead to conclusions at variance with the reasonable probabilities of the case, and would show the year of Ackerman's occupancy to have been a year of productiveness many times greater than any since or before. Upon the best judgment I can form from the whole of the evidence, I am unwilling to say that the master's report in these respects is unwarranted by the proofs, and am therefore of opinion that the first six of the exceptions should be disallowed.

As to the remaining three of the exceptions, that is to say, the seventh, eighth, and ninth, my opinion is different. These relate to matters susceptible of more exact calculations and more definite judgment. The seventh and eighth relate to the allowance of interest. The master has allowed none on the rents arising from the trust property and collected by Ackerman or his estate, from the year 1850 to 1856 inclusive. For each of these years rents were regularly collected. They are charged by the master, and are accurately known. Interest is charged on them, or they are incorporated into the balance on which interest is computed from January 1st, 1857. I see no reason why, as the defendant or his estate received these amounts, interest should not begin to accrue from the dates of the yearly receipts. It would seem as matter of right to be due the complainant. I have computed it at six per cent. for each of the first six years, and find the total for the six years to be $124.05. This sum should have been deducted from the $311.54 balance against the complainant on the 1st of January, 1857. It would then have carried interest from that date to August 1st, 1871, the date of the master's report. This additional interest would, at the same rate, be $108.50. To correct the report upon this exception, the sum of $226.50 should be added to the amount due August 1st, 1871.

The eighth exception claims interest on $2037 from May 20th, 1856, to January 1st, 1857. This sum was the net price for which the Virginia property was sold to Whittaker,

and it was received by Ackerman's· estate, May 20th, 1856. No interest is allowed by the master to January 1st, 1857. This omission, I think, should be corrected. The amount of the interest at six per cent., is $75.33, which, if credited to complainant, in the balance of January 1st, 1857, would have increased the balance due, August 1st, 1871, by the sum of $141.09. To correct the report upon this exception, the latter sum should be added ·at the last named date.

The ninth and last exception relates to commissions. The sum of $173.50 is allowed by the master in favor of the defendants and is introduced in the account as of November 1st, 1859. I am of opinion that no commissions in this case ought to be allowed. The assignee's charges for his services and time are allowed as such by the master, and together with the questionable manner in which the trust has been generally performed, should exclude the further allowance of commissions under the statute on the amount of the receipts. The interest on this sum of $173.50, from November 1st, 1859, to August 1st, 1871, at six per cent., is $122.31, which, together with the principal, should be added to the balance due, as shown by the report, at the last named date.

The total sum to be added to the amount found to be due by the master, is consequently the sum of $669.45. By adding this sum, the amount due from the estate of John Ackerman, Jr., deceased, to the complainant, on the 1st of August, 1871, will be $4307.04, for which, with interest from the date of the report, the complainant is entitled to a decree.

This amount differs considerably from some of the several résults I have been disposed to adopt in looking at the case from different standpoints, and with reference to different aspects of the evidence. But upon the whole, my conclusion now reached is more satisfactory than any other I have considered, and I think, more nearly adjusted to all the known and all the probable equities in the case. The extravagant claims set up in the bill and attempted to be sustained by the complainant himself, have not impressed me with the convic-

tion that his recollections and statements, or those of the witnesses he has produced, can be accepted with confidence against Ackerman, who is dead. Nor, on the other hand, can I see reason to justify the conclusion that the accounts were settled in Ackerman's life. I think they were not. The parties, by their own acts and management, have covered the case with obscurity and difficulties, and if exact justice cannot now be done, it is due to themselves that it is so.